849 F.2d 1111
 128 L.R.R.M. (BNA) 2750, 57 USLW 2028,
110 Lab.Cas. P 10,775
 ALTON & SOUTHERN LODGE NO. 306 BROTHERHOOD RAILWAY CARMEN OF
the UNITED STATES AND CANADA, Appellee,
v.
The ALTON & SOUTHERN RAILWAY CO., Appellant.
ALTON & SOUTHERN LODGE NO. 306 BROTHERHOOD RAILWAY CARMEN OF
the UNITED STATES AND CANADA, Appellant,
v.
The ALTON & SOUTHERN RAILWAY CO., Appellee.
 Nos. 87-1151, 87-1139.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 13, 1987.
Decided June 21, 1988.
Rehearing and Rehearing En Banc Denied Sept. 14, 1988.
 
 Paul C. Hetterman, St. Louis, Mo., for appellant.
 Nina K. Wuestling, St. Louis, Mo., for appellee.
 Before HEANEY and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Alton & Southern Lodge No. 306 (Lodge 306) appeals from the order of the district court[1] denying its request for injunctive relief. Alton & Southern Railway Company (Alton & Southern) cross-appeals from the district court's denial as moot Alton & Southern's motion to reopen the record to admit a National Railroad Adjustment Board (NRAB) award into evidence. We affirm as to both appeals.
 
 
 2
 Lodge 306 is a labor organization composed of carmen employed by Alton & Southern. From approximately 1947 to 1983, the carmen of Lodge 306 who were assigned to the repair track worked from 7:00 a.m. to 3:00 p.m., including a twenty-minute paid lunch period. On November 22, 1983, after two unsuccessful attempts to negotiate a new work schedule, Alton & Southern unilaterally changed the fourteen carmen's hours to 8:00 a.m. to 4:30 p.m., with a thirty-minute unpaid lunch period. On April 5, 1984, Lodge 306 brought a suit in Missouri state court, alleging violation of the collective bargaining agreement. Alton & Southern removed the suit to federal district court. At approximately this same time, Lodge 306 also filed similar claims with the NRAB.
 
 
 3
 The general collective bargaining agreement governing rates of pay, rules, and working conditions provides, in relevant part, as follows:
 
 
 4
 Rule 1: Eight (8) hours shall constitute a day's work, and five (5) days per week for the regular forces.
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 Note: The expression[ ] * * * "work" used in this Rule refer[s] to service, duties or operations necessary to be performed * * *.
 
 
 8
 Rule 2: When one shift is employed, the starting time shall not be earlier than 7:00 a.m., nor later than 8:00 a.m. The time and length of the lunch period shall be subject to mutual agreement with the Committee.
 
 
 9
 Rule 3: When more than one shift is employed, the starting time of the first shift shall be governed by Rule 2. The starting time of the second, or the second and third shifts shall be arranged for the best interest of the work to be performed, but in no case inconsistent with the employee's welfare. Each shift shall consist of eight (8) consecutive hours, including an allowance of twenty (20) minutes for lunch within the limits of the fourth and fifth hours. When service requirements will not permit the taking of the lunch period within the fourth and fifth hours as per this rule, a penalty time of twenty (20) minutes at pro rata rate will be allowed and the employee will be allowed to procure lunch without loss of time as soon thereafter as possible.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 Rule 7: Employees assigned under the provisions of Rule 2 required to work during the lunch period will be paid for one-half hour at straight time and be allowed the necessary time to procure lunch without loss of time.
 
 
 13
 Under the Railway Labor Act, 45 U.S.C. Secs. 151 et seq. (1986), labor disputes are characterized either as major or minor. In essence, a major dispute involves the formation or alteration of a collective bargaining agreement covering pay, rules, or working conditions, while a minor dispute merely involves differing interpretations of such an agreement. See Missouri Pacific Joint Protective Bd., Bhd. Ry. Carmen of the United States and Canada, AFL-CIO v. Missouri Pacific R.R. Co., 730 F.2d 533, 536 (8th Cir.1984) (Missouri Pacific ); Indep. Fed'n of Flight Attendants v. Trans World Airlines, Inc., 655 F.2d 155, 158 (8th Cir.1981) (Flight Attendants ). In other words, a major dispute concerns one party's attempt to "acquir[e]" new "rights for the future," rather than asserting rights that arguably exist under the current agreement, as in a minor dispute. Elgin, Joliet, and Eastern Ry. v. Burley, 325 U.S. 711, 723-24, 65 S.Ct. 1282, 1289-90, 89 L.Ed. 1886 (1945), aff'd on rehearing, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). When the surrounding circumstances are ambiguous, the courts favor construing disputes as minor. See Brotherhood of Locomotive Eng'rs v. Atchison, Topeka and Santa Fe Ry. Co., 768 F.2d 914, 920 (7th Cir.1985) (citations omitted).
 
 
 14
 If a dispute is major, the federal courts may readily issue an injunction to preserve the status quo during an ongoing labor board mediation. If the dispute is minor, however, the federal courts will only rarely issue an injunction, utilizing traditional equitable principles. Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co., 802 F.2d 1016, 1021-22 (8th Cir.1986) (Arnold, J., for a unanimous court) (Burlington Northern ). In addition, when the dispute is minor, one party may make small alterations in the working conditions unilaterally pending the NRAB's resolution. Id. at 1021.
 
 
 15
 The first step in determining whether a dispute is major or minor is to ascertain the content of the collective bargaining agreement. Burlington Northern, 802 F.2d at 1022. Long-standing working relationships, customs, and practices, although not reduced to writing, are to be considered as implied terms in the agreement when they have ripened into an established and recognized custom between the parties. Id. The district court found that the parties' established past practices were "clearly relevant" in determining the terms of the agreement between them, but also found that the past practices did not supply a term or condition of the working relationship between the parties that was not included within the written agreement. Alton & Southern Lodge No. 306, Bhd. Ry. Carmen of the United States and Canada v. Alton and Southern Ry. Co., 651 F.Supp. 1190, 1192-93 (E.D.Mo.1987) (Alton & Southern ). The determination of the terms of an agreement is a question of fact that may be reversed only if clearly erroneous, Brotherhood of Maintenance of Way Employees v. Chicago and Northwestern Transp. Co., 827 F.2d 330, 334 (8th Cir.1987) (Chicago and Northwestern ), and we hold that the district court's determination in this regard was not clearly erroneous.
 
 
 16
 The next question is whether the agreement is " 'reasonably susceptible' " to the interpretations sought by both parties. Flight Attendants, 655 F.2d at 158-59 (quoting United Transp. Union v. Burlington Northern, Inc., 458 F.2d 354, 357 (8th Cir.1972)). If it is, the dispute is minor. Id. Although this is a legal question that we may review de novo, Chicago and Northwestern, 827 F.2d at 334, we agree with the district court's decision on this issue and adopt its reasoning. After acknowledging the relevance of past practices to the determination of the contents of the agreement, the district court nevertheless found that the express terms of the agreement controlled the dispute. Alton & Southern, 651 F.Supp. at 1192-93 ("[t]his case * * * does not present a situation where the practice of the parties fills in for circumstances not covered by the agreement").
 
 
 17
 We agree. In the process of determining whether an agreement is reasonably susceptible to a party's proposed interpretation, or whether that interpretation is "arguably comprehended" within the agreement, see Burlington Northern, 802 F.2d at 1022, "evidence of past practice is not dispositive in the face of contrary indications from the agreements' language." Brotherhood of Ry. Carmen of the United States and Canada, AFL-CIO-CLC v. Norfolk and Western Ry. Co., 745 F.2d 370, 377 (6th Cir.1984); see Railway Labor Executives Ass'n v. Norfolk and Western Ry. Co., 833 F.2d 700, 705 n. 4 (7th Cir.1987) ("parties cannot use evidence of past practices to contradict the explicit language of their written agreement in an effort to change the characterization of a dispute as either major or minor"); Air Line Pilots Ass'n v. Trans World Airlines, 713 F.2d 940, 948 (2d Cir.1983) ("when there is a 'clearly governing provision in the present agreements,' [the court] need not range beyond the interpretation of the language of the agreement") (citation omitted), aff'd in part rev'd in part sub nom. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).[2]
 
 
 18
 The terms of the agreement for a single shift cover starting time, see Rule 2 ("starting time shall not be earlier than 7:00 a.m., nor later than 8:00 a.m."), the time and duration of lunch, see id. ("[t]he time and length of the lunch period shall be subject to mutual agreement with the Committee"), and for what activities the employees will be paid. See Rule 1 (employees must perform necessary service or duties for eight hours each day). We agree with the district court that in the light of these express provisions, evidence of past practices is not controlling.
 
 
 19
 Alton & Southern's interpretation that it may change the starting time to 8:00 a.m. is at least arguably comprehended within Rule 2. Lodge 306 does not contest this point. Rule 2 also expressly provides that the time and length of the lunch period "shall be subject to mutual agreement with the Committee." Alton & Southern complied with this provision, twice attempting to negotiate a new agreement before exercising its right to effect a unilateral change during the resolution of the minor dispute. See Burlington Northern, 802 F.2d at 1021. Similarly, the terms of the agreement also arguably comprehend Alton & Southern's interpretation of the issue of payment for time spent eating lunch. Rule 1 provides that employees will receive eight hours of pay for eight hours of work and defines work in such a way as to exclude, at least arguably, eating lunch. In addition, Rule 7 can be read reasonably to imply that lunch is unpaid, because it requires Alton & Southern to pay employees one-half hour at straight time if they must work through lunch. By contrast, Rule 3 expressly provides for a paid lunch when two or three shifts are employed, a provision that is conspicuously absent from the rule governing a single shift. For these reasons, we find that Alton & Southern has met its "relatively light burden" of demonstrating that its interpretation is arguably comprehended within the agreement and that therefore the dispute is minor. See Burlington Northern, 802 F.2d at 1022. Furthermore, even considering past practices in conjunction with the agreement, we do not find Alton & Southern's interpretation so unreasonable as to be " 'obviously unsubstantial.' " Flight Attendants, 655 F.2d at 159 (citation omitted).
 
 
 20
 We also agree with the district court that Lodge 306 failed to make the requisite showing under traditional equitable principles to justify the issuance of an injunction in a minor dispute, because any injury sustained by Lodge 306 would be compensable by money damages.
 
 
 21
 The judgment dismissing Lodge 306's complaint and denying as moot Alton & Southern's motion to reopen the record is affirmed.
 
 
 22
 HEANEY, Circuit Judge, dissenting.
 
 
 23
 I respectfully dissent. The United States Supreme Court made it clear in The Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), that a railroad must maintain the status quo with respect to "actual objective working conditions * * *, irrespective of whether these conditions are covered in an existing collective agreement." Id. at 143, 90 S.Ct. at 295. The Court stated:
 
 
 24
 It is quite apparent that under our interpretation of the status quo requirement, the argument advanced by the Shore Line has little merit. The railroad contends that a party is bound to preserve the status quo in only those working conditions covered in the parties' existing collective agreement, but nothing in the status quo provisions of Secs. 5, 6, or 10 suggests this restriction. We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement. Thus, the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions. Here, however, the dispute over the railroad's establishment of the Trenton assignments arose at a time when actual working conditions did not include such assignments. It was therefore incumbent upon the railroad by virtue of Sec. 6 to refrain from making outlying assignments at Trenton or any other place in which there had previously been none, regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement.
 
 
 25
 Id. at 153-54, 90 S.Ct. at 301 (emphasis added and footnote omitted).
 
 
 26
 Here, the district court found, and the railroad does not dispute, that for thirty years the railroad's carmen worked from 7:00 a.m. to 3:00 p.m., with a twenty minute paid lunch break. In 1983, the railroad decided that it wanted to discontinue the paid lunch period. It negotiated for a short period concerning this subject with the union. When the union would not agree to the proposed change, the railroad unilaterally discontinued the paid lunch period without complying with the mediation provisions of the Railway Labor Act. Given these facts, Detroit & Toledo Shore Line R.R. requires us to reverse the district court.
 
 
 27
 The majority asserts that the past practice rule is applicable only where the practice of the parties fills in for circumstances not covered by the agreement. This view is directly contrary to Supreme Court doctrine and should not be adopted by this Court. The only question in this circumstance should be the one posed by Judge Arnold, writing for the Court in Independent Federation of Flight Attendants v. Trans World Airlines, Inc., 655 F.2d 155 (8th Cir.1981).
 
 
 28
 Section 6 of the Act applies only where there is an intended change "in agreements affecting ... working conditions" of the employees. The term "working conditions" is to be broadly interpreted. * * * It includes those actual, objective working conditions out of which the dispute arose and which may not necessarily be covered in an existing collective bargaining agreement. * * * These conditions, however, must have achieved the level of established practices and customs. * * * We have held that "to establish a long-standing custom and practice, the conduct of the parties must encompass a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status."
 
 
 29
 Id. at 157 (emphasis added and citations omitted).
 
 
 30
 Judge Arnold went on to point out that in the case under consideration the practice had not been elevated to implied contractual status. Here, however, it cannot be argued that the practice was not clearly established. Indeed, the contrary seems to be conceded. The argument relied upon by the majority, rather, is that if the collective bargaining agreement can arguably be interpreted to permit the railroad to do what it wants to do, the established past practice rule of the Supreme Court in Detroit & Toledo Shore Line R.R. is not applicable. The majority's erroneous interpretation thus effectively overrules Detroit & Toledo Shore Line R.R.
 
 
 31
 This Court followed Independent Federation of Flight Attendants in Missouri Pacific Joint Protective Bd. v. Missouri-Pacific R.R., 730 F.2d 533 (8th Cir.1984) (MoPac). There, Judge John R. Gibson, writing for the Court, stated:
 
 
 32
 In the instant case there is at least one factual issue that needs to be determined. Whether MoPac has engaged in similar operational changes in the past which would amount to "established past practices" is in dispute. While MoPac argues that it has been making similar operational changes for at least ten years, the Brotherhood denies that there are any established past practices justifying MoPac's actions, and contends that it was not aware of any similar prior operational changes. Whether MoPac has made similar operational changes capable of constituting "established past practices" could be significant, if not determinative, in the resolution of whether the dispute is major or minor.
 
 
 33
 Id. at 537 (citations omitted).
 
 
 34
 We again followed Independent Federation of Flight Attendants in Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co., 802 F.2d 1016 (8th Cir.1986). There Judge Arnold, writing for the Court, stated:
 
 
 35
 When longstanding practice ripens into an established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were a part of the collective-bargaining agreement itself. Such practices have been described as the "actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose." Detroit & Toledo Shore Line Railroad v. United Transportation Union, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969).
 
 
 36
 * * *
 
 
 37
 * * *
 
 
 38
 Applying these principles to the facts of the present case, we note that nothing in the collective-bargaining agreement refers in any way to Rule G or to enforcement or investigation methods. Nevertheless, we agree with the District Court that the union has long shared in BN's concern over the abuse of alcohol and drugs by employees on the job. Accordingly, the parties have acquiesced in certain detection and investigation methods over the years, and these practices may fairly be considered to have become the status quo. That being so, the railroad may not depart from these established practices in such a substantial way as to abrogate the implied contractual term which they represent. But so long as the railroad keeps within the bounds of this understanding, the employees are not entitled to an injunction against minor changes in method which are reasonably within the agreement.
 
 
 39
 Id. at 1022.
 
 
 40
 Here, the railroad is not making a minor change. It is abrogating a longstanding established practice of paying employees for their lunch period. It should be enjoined from doing so until such time as it complies with the provisions of Section 6 of the Railway Labor Act.
 
 
 41
 If the majority's opinion is permitted to stand, we will reduce the past practice rule established in Detroit & Toledo Shore Line R.R. to a meaningless phrase. We are not permitted to do this.
 
 
 
 [1]
 The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 None of the cases cited by Lodge 306 that place paramount importance on past practices involved disputes covered by the written terms of a bargaining agreement. See Detroit and Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 153-54, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969); Chicago and Northwestern, 827 F.2d at 334; Burlington Northern, 802 F.2d at 1022; Flight Attendants, 655 F.2d at 159